**AFFIRMED and Opinion Filed April 12, 2023**



**In The**

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-22-00529-CV

## CITY OF DALLAS, Appellant
## V.
## LATOYA K. PORTER, Appellee

### On Appeal from the 14th Judicial District Court
### Dallas County, Texas
### Trial Court Cause No. DC-19-17257

## MEMORANDUM OPINION

Before Justices Pedersen, III and Garcia[1]
Opinion by Justice Pedersen, III

The City of Dallas appeals the trial court's May 26, 2022 Order, which denied the City's plea to the jurisdiction. The City contends that the trial court erred by denying the plea because appellee LaToya K. Porter's retaliation claim does not fall within the limited waiver of the City's immunity from suit provided by the Texas Commission on Human Rights Act (the TCHRA). *See* TEX. LAB. CODE ANN. § 21.055. Specifically, the City argues that Porter failed to raise a genuine issue of

---

[1] Justice Lana Myers was a member of the original panel but, due to her retirement from the Court, she did not participate in the issuance of this opinion.

material fact on two elements of her claim: (1) that she engaged in activity protected by the TCHRA; and (2) that, but for her engaging in that protected activity, she would not have been discharged. The City also alleges that Porter has pleaded a number of retaliation claims that should be dismissed as time-barred. We affirm the trial court's Order.

## Background

The factual background of this case includes two independent narratives involving Porter while she served as a Major in the Dallas Police Department (the DPD). The events developed close in time: one series of events involved Porter's participation in the 2017 process of identifying candidates for promotion to sergeant in the DPD, and the second involved Porter's role in a subordinate's 2017 claim of discrimination. The City contends that the first series of events caused Porter's discharge; Porter argues that the second was the actual reason the City discharged her. We relate both narratives with only as much detail as necessary to decide the issues before us.

### *The 2017 Sergeant's Assessment Center*

The DPD promotes individuals to the rank of sergeant based on a two-step process. Candidates first take a written exam administered by the City's Civil Service Department. Those who do well enough on the exam participate in a three-day assessment center, where three representatives from an outside vendor present

law-enforcement scenarios, to which the candidates respond. Promotion is then based on a combined score from the written exam and the assessment center.

The 2017 sergeant's assessment center (the Assessment Center) was conducted by IO Solutions (IOS), which sought assistance from DPD subject-matter experts (SMEs) to help craft the Assessment Center scenarios. Porter was one of a group of DPD officers invited to participate as an SME; she volunteered to do so, and she was selected. By serving as an SME, she had access to confidential testing information, including grading criteria and the nature of certain scenarios likely to be presented to the sergeant candidates. Porter signed agreements with IOS and the Civil Service Department promising to keep confidential all information she learned concerning the assessment center.

The City contends that neither IOS nor the Civil Service Department knew that Porter and another DPD officer, Elizabeth Gates, had started a business earlier in 2017, called Rank and File Development Group (RFDG), in which the two women helped officers prepare for promotional exams. Porter had appropriately informed the DPD of her business in June 2017. It is undisputed that RFDG provided training for some officers preparing for the 2017 Assessment Center. The amount and nature of Porter's participation in any specific training is contested.

An incident occurred in October 2017 involving one of RFDG's clients, Senior Corporal Ashley O'Neal, who had failed to register properly for the Assessment Center. Porter and Gates met with Civil Service personnel concerning

–3–

whether O'Neal could be allowed to participate despite her lack of registration. The parties contest the tone of this meeting. A Civil Service employee stated that Porter and Gates "began forcefully trying to talk us into allowing [O'Neal] to participate." She quoted Porter, who said: "What can we do to fix this; I know you can accommodate Ms. O'Neal; she's a good officer." The employee wrote that she believed Porter and Gates "were trying to talk us into allowing [O'Neal] to move forward based on their authority and forcefulness." Porter's declaration denied the City's contention that she had attempted unduly to influence a Civil Service employee and stated: "I acted professionally and appropriately as an advocate for a subordinate. I would do and have done the same for others who were not paying customers."

The Assessment Center was scheduled to begin on November 8, 2017. That morning, an anonymous caller told an IOS employee that the Assessment Center had been compromised because Porter had served as an SME for IOS while she was coaching officers seeking promotion. IOS notified the Civil Service Department and DPD's personnel office. Lieutenant Irene Alanis was the acting chief of personnel at the time. Earlier on November 8, Alanis had learned through conversation with a colleague that Porter—who Alanis knew to be acting as an SME for the Assessment Center—was also coaching promotion candidates for a fee. After her department was notified of the anonymous call to IOS, Alanis notified then-Major William

–4–

Griffith, the Commander of the Internal Affairs Division (the IAD).[2] She then met with Griffith, Assistant Chief Paul Stokes (Porter's immediate supervisor), and Lieutenant Michael Igo (an IAD investigator). That same day, Alanis submitted a Request for Control Number that was signed by Stokes, requesting an IAD investigation of Porter.[3] Igo was assigned that day to lead the IAD investigation, which began immediately.

On November 9, after hearing rumors of an investigation, Porter met with Igo and Griffith; Griffith said he could not confirm the existence of an investigation. But on November 14, Igo did confirm to Porter that he was investigating her actions in connection with the Assessment Center. Throughout the investigation and in response to the City's plea, Porter denied sharing any information she learned in her SME role.

On November 16, a law firm representing RGFD sent a letter to the business's clients that stated:

> Please remember that the waiver you signed stated that you will not disclose any materials that you were given as a part of the assessment training. Furthermore, you agreed that you will not discuss the assessment training with anyone.
>
> This letter is sent as a reminder of your duties under the waiver, and should in no way be construed as a threat of law suit, or waiver of rights by Rank and File™. If you have questions regarding your duties under the waiver, you may contact legal counsel to discuss. If you have any

---

[2] Griffith was also serving as an SME for the Assessment Center.

[3] A Request for Control Number (RFCN) is the form an officer submits to the IAD to request an investigation by that division. Officers sometimes refer to the form as a Blue Team.

questions regarding the actual waiver itself, please do not hesitate to contact our office.

The City contends this letter represented an effort by Porter to interfere in the IAD's investigation. Porter's testimony pointed out that IAD interviews of her clients did not halt after the letter was sent. She also testified that the RFDG lawyer promptly sent a follow-up letter after learning that there was an investigation and that the IAD contended the first letter was inappropriate. Igo acknowledged that on December 7, the law firm "sen[t] certified letters to clients of RFDG encouraging them to participate in the investigation without the fear of unlawful disclosure."

On November 22, Porter was placed on administrative leave.

Igo submitted a lengthy report addressed to then-Chief of Police U. Renee Hall, setting forth the evidence he developed during the investigation.[4] The report sustained four allegations against Porter, stating that she engaged in adverse conduct, created a conflict of interest during a Civil Service meeting, interfered with an administrative investigation, and gave misleading and conflicting statements during the investigation; the allegation concerning Porter's giving misleading and conflicting statements was subsequently withdrawn by Hall. Based on the IAD investigation, DPD requested to redo the Assessment Center, and the Civil Service Board supported that request at a February 6, 2018 meeting.

---

[4] The City submitted only excerpts of the report in support of its plea to the jurisdiction.

It is unclear when Igo's investigation was completed. The report addressed to Hall is dated March 6, 2018, approximately four months after Igo was assigned to oversee the investigation. IGO testified in his deposition that he signed the report on that day. But the City asserts that one result of the IAD investigation was the Civil Service Board's February 6 approval of DPD's request to redo the Assessment Center that had purportedly been compromised. The approval was based on information provided at the meeting by Igo. Thus, it appears that—at a minimum—Porter had reached his conclusion that the Assessment Center had been compromised by Porter by early February.

Igo's report attaches findings and conclusions that are signed by Executive Assistant Chief of Police David Pughes and Chief Hall. This portion of the report contains the same heading and date, March 6, 2018. It identifies three purported violations of the DPD Code of Conduct, asserting that Porter:

> [1] served as an SME for the sergeant assessment examination (which allowed her to have knowledge of the test material and grading scale) and also trained sergeant candidates for this particular test, along with her business partner (a fellow police officer) for a fee under the business she formed as RFDG. . . .
>
> [2] as a Major of the Dallas Police Department, on duty and in uniform, went to the Civil Service office on October 18, 2017, with Senior Corporal O'Neal, her business client, and attempted to persuade the Civil Service personnel to allow Senior Corporal O'Neal to take the sergeant assessment center test. . . . [and]
>
> [3] on November 16, 2017, her attorney, after consulting with her, sent her clients certified letters advising them against discussing or disclosing any information they obtained through her training. This

action interfered with the integrity of an administrative investigation, of which she was made aware.

Our record contains little information concerning any events that occurred in the investigation between March 6, 2018, and October 30 of that year. On October 30, Chief Hall informed the IAD that she wanted the division "[to] take the necessary steps to circumvent the normal disciplinary process so I may make an immediate decision" in Porter's investigation. The IAD scheduled Porter's disciplinary hearing before Hall for November 1, 2018.

*Reporting Discrimination Against Officer Madison*

In October 2017, Porter supervised hundreds of DPD personnel at the North Central Patrol Division, where she served as Acting Commander. On October 15, Porter received a phone call from one of those subordinates, Officer LaTrice Madison, a female, African-American police officer. Porter testified that Madison was extremely upset on the call; she complained to Porter that her immediate supervisor, Sergeant Stephen Gross, a White male, was making unwanted sexual advances and racially offensive comments in one-on-one meetings with her and thereby creating a hostile work environment.

Porter informed her own immediate supervisor, Assistant Chief Stokes, of Madison's allegations, and he instructed her to conduct a preliminary investigation of the matter. The day after she received Madison's call, Porter met with Gross, informed him of Madison's allegation, and inquired about his interactions with her. Gross admitted meeting alone with Madison, purportedly "to counsel her regarding

–8–

minor issues related to her work," but he had no documentation regarding the meetings or the issues he claimed to be counseling her about. Porter also interviewed Gross's other subordinates; they denied having had similar meetings with him. On October 21, 2017, Porter requested and obtained a transfer for Madison to the Central Patrol Division.

On October l7, 2017, the Friday before Madison's transfer took place, Gross emailed Porter stating that he had "come across a possible concern regarding Officer Madison" and was having co-workers look into this "concern." The day after Madison's transfer, Porter received a report "purporting to document that Officer Madison had not appropriately completed call records." Porter requested the sergeant presenting the report to obtain similar records for all of Gross's direct reports to determine if Madison was being unfairly targeted as a result of her complaint. Porter obtained and reviewed those records and learned that the misconduct reported concerning Madison "as occurring among her peers as well and that Officer Madison appeared to have been unfairly singled out." Porter viewed this as evidence of retaliation for Madison's having made her complaint against Gross.

Porter believed that IAD should be notified to investigate Madison's allegations, but Stokes told her he wanted any investigation to remain at the station. On November 7, Porter completed a RFCN summarizing Madison's allegations that Gross was creating a hostile work involvement. Porter then explained:

> This Blue Team is delayed based on Assistant Chief Stokes['s] verbal directive to take care of this at the station. However, after reviewing the policy and conducting a preliminary investigation and based on the evidence I believe that the Internal Affairs Division is better suited to handle this investigation.

The following day, on November 8, after learning that Porter had submitted the RFCN, Stokes had the request withdrawn, summoned Porter to his office, and "yelled" at her for submitting it as she did. Porter continued to insist to Stokes that the matter should be investigated by IAD.

Porter testified that, on November 9, she prepared a memo documenting Gross's alleged misconduct toward Madison and sent the memo to both Stokes and to Stokes's superior, Assistant Chief Gary Tittle. Stokes then approved a RFCN based on Madison's allegations against Gross.

Porter testified that three sergeants, including Gross, wrote up allegations against Madison and requested a formal investigation of Madison by the IAD. Stokes approved and signed that RFCN on November 15, 2017. According to Porter, the IAD investigator's report "shows that considerable resources were brought to bear to investigate Officer Madison, while no effort was made to investigate Officer Madison's allegations of sexual harassment or [Porter's] allegation regarding the retaliation directed towards Officer Madison." The investigation was resolved against Madison concerning allegations she failed to follow procedure, and it concluded that her allegations against Gross were "unfounded."

Porter testified that she continued—even to her termination hearing—to insist that Madison's allegations against Gross be investigated thoroughly.

*Porter's Termination*

The two narratives converged November 1, 2018, when Porter appeared before Chief Hall for her disciplinary hearing. Porter complains that Hall cut her off at the hearing when Porter attempted to insist—as she had throughout the IAD investigation—that "Officer Madison's allegations must be investigated and that DPD policies were not being followed" in regard to investigating retaliation against her and Madison. Hall testified that Porter continually deviated from discussing the issues before her, i.e., the issues relating to the Assessment Center. Hall told Porter at the November 1 hearing that she was terminated and followed up with a letter informing Porter that her termination was effective that same day. The November 1 letter cited the same three reasons identified in Igo's March 6 report. The Chief testified that she discharged Porter because her "lack of integrity and unethical behavior in her violation of our Code of Conduct was willful. It was willful disregard with no—no remorse [and] [w]arranted for her to be terminated."

**The Plea to the Jurisdiction**

A city, as a political subdivision of a state, is entitled to governmental immunity unless it has been waived. *Reata Const. Corp. v. City of Dallas*, 197 S.W.3d 371, 374 (Tex. 2006). This immunity deprives a trial court of subject matter jurisdiction. *Id.* The TCHRA waives governmental immunity, but only to the extent

the plaintiff states a claim for conduct that actually violates the statute. *Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 770 (Tex. 2018). Immunity from suit may be asserted by a plea to the jurisdiction. *Id.* When the plea challenges jurisdictional facts with supporting evidence, as the City's plea does in this case, "we must move beyond the pleadings and consider evidence when necessary to resolve the jurisdictional issues, even if the evidence implicates both subject-matter jurisdiction and the merits of a claim." *Id.* at 770–71. Our standard of review in this case mirrors that of a traditional summary judgment: to avoid dismissal the plaintiff must raise a genuine issue of material on each element of her claim. *Id.* at 771. We take as true all evidence favorable to the plaintiff, and we indulge every reasonable inference and resolve any doubts in her favor. *Id.*

In its first issue, the City argues broadly that Porter's plea was insufficient to invoke a waiver of the City's immunity from suit. In its second and third issues, the City contends specifically that Porter cannot create a genuine issue of material fact on two elements of her retaliation claim, i.e., participation in a protected activity and causation. And in its fourth issue, the City argues that its plea should have been granted as to time-barred claims. We address the three specific arguments first and then conclude whether the plea was sufficient to invoke a waiver of the City's immunity.

–12–

*Elements of Porter's Retaliation Claim*

The TCHRA prohibits an employer's taking a retaliatory action against an employee because that employee opposed a discriminatory practice. TEX. LAB. CODE ANN. § 21.055(1); *San Antonio Water Sys. v. Nicholas*, 461 S.W.3d 131, 137 (Tex. 2015). To establish a claim for retaliation, the employee must show that: (1) she engaged in an activity protected by the TCHRA, (2) an adverse employment action occurred, and (3) a causal link exists between the protected activity and the adverse action. *Nicholas,* 461 S.W.2d at 137. The City alleges that Porter cannot raise a genuine issue of material fact on the first and third elements, i.e., that she engaged in protected activity and that—but for her engaging in such protected activity—she would not have been discharged when she was.[5]

(1)     Engaging in Protected Activity

Section 21.055 includes a list of four activities that are protected against retaliation; the first activity listed is "opposes a discriminatory practice." LAB. § 21.055(1). Opposition to a discriminatory practice is a protected activity regardless of the merits of the underlying discrimination claim. *San Antonio Water Sys. v. Nicholas*, 461 S.W.3d 131, 137 (Tex. 2015). An employee establishes that she

---

[5] Like most TCHRA cases, Porter's retaliation claim depends on circumstantial evidence. Thus, our analysis parallels the well settled burden-shifting analysis developed in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–05 (1973). At this point in the litigation, however, the City does not challenge Porter's claim that her discharge was an adverse employment action or Porter's ability to establish a prima facie claim of causation. Accordingly our focus is upon the two challenged elements: whether Porter engaged in a protected activity and—if the City articulated a legitimate non-retaliatory reason for Porter's discharge—whether she can establish a causal link between her protected activity and her discharge.

opposed a discriminatory practice by demonstrating that she had a good-faith, reasonable belief that the underlying discriminatory practice violated the TCHRA. *Id.* In addition, to be protected, the employee's conduct must alert the employer to the employee's reasonable belief that unlawful discrimination is at issue. *Tex. Dep't of Transp. v. Lara*, 625 S.W.3d 46, 59 (Tex. 2021). If the actor is in a supervisory position, the conduct must be taken in opposition to her employer; the report cannot be merely a ministerial act required by the actor's job. *See Miskevitch v. 7-Eleven, Inc.*, No. 05-17-00099-CV, 2018 WL 3569670, at *2 (Tex. App.—Dallas July 25, 2018, no pet.) (mem. op.).

In this case, Porter argues that her protected activity was reporting Officer Madison's discrimination complaints involving Sergeant Gross to Internal Affairs on November 7, 2017. Her report was made on the RFCN form, also called a Blue Team report. Porter summarized Madison's allegations that Gross was creating a hostile work involvement. Porter then explained:

> This Blue Team is delayed based on Assistant Chief Stokes verbal directive to take care of this at the station. However, after reviewing the policy and conducting a preliminary investigation and based on the evidence I believe that the Internal Affairs Division is better suited to handle this investigation.

On its face, this is a report from Porter of discriminatory conduct by Gross.

The City argues, however, that the report is not evidence of *opposition* to a discriminatory practice, because reporting Madison's allegations was no more than

a ministerial duty inherent in Porter's supervisory position. The City relies on Porter's deposition testimony, which included the following exchange:

> Q. [A]s a major in the department, what was your role in terms of taking action if you become aware that one of your subordinates has violated the City's rules or the department's procedures?
>
> A. You're supposed to document it, discuss it with a supervisor, and go from there.

Porter agreed that this is what she did when she looked into Madison's complaint, and she agreed that doing so was part of her job responsibilities. Relying on *Miskevitch*, the City argues that reporting Madison's complaints first to Stokes, and then to Internal Affairs, was merely her ministerial duty as a supervisor. *See Miskevitch*, 2018 WL 3569670, at *2 (supervisor had ministerial duty to forward employee's complaint of sexual harassment; doing so was not opposition to employer).

If Porter's involvement with Madison's complaint had ended with her initial October report to Stokes following Madison's phone call, we might agree that this case is similar to *Miskevitch*. In that case, Miskevitch's conduct was limited to "forwarding" her employee's sexual harassment complaint to her own immediate supervisor. *Id.* at *1. Here, after Porter initially reported Madison's allegations to Stokes, she was instructed to perform a preliminary investigation of those allegations. Porter interviewed Gross and others he supervised, and—based on those interviews—she obtained approval to transfer Madison away from Gross. In the course of this process, Porter received an email regarding Gross's "possible concern"

–15–

with a purported failure by Madison to document call records, and Porter received a report complaining of Madison's purported violations immediately after her transfer. Concerned the email and report signaled retaliation against Madison, Porter investigated further and ultimately concluded that the matter should be investigated formally by Internal Affairs. To that end she completed the RFCN. We conclude that Porter's participation in Madison's complaint was not comparable to Miskevitch's ministerial forwarding of an employee's complaint.

Moreover, taking Porter's evidence as true, as we must, *see Alamo Heights*, 544 S.W.3d at 771, her making the request to Internal Affairs appears to have been in opposition to her own supervisor's directive to avoid a formal investigation. Porter specifically refers in the report to "Stokes['s] verbal directive to take care of this at the station." And Stokes's reaction to Porter's report was to delete it, to summon her to his office, and to "yell" at her for submitting it as she did. Regardless of the fact that Stokes was ultimately persuaded to support the investigation, Porter has offered evidence that she had a good faith, reasonable belief that her report to Internal Affairs was made in opposition to her superior's position that Madison's allegations should not be formally investigated.

We conclude that Porter has offered sufficient evidence to raise a material issue of fact on whether she participated in an activity protected by TCHRA by opposing a discriminatory practice. We overrule the City's second issue.

(2)   Engaging in Protected Activity Was the Cause of Porter's Discharge.

In the City's third issue, it contends that Porter failed to create a genuine issue of material fact as to whether, but for her alleged protected activity, she would not have been discharged when she was. The City asserts that Porter's employment was terminated for three "legitimate and non-retaliatory" reasons: (1) a conflict of interest created by her service as an SME for the 2017 sergeant's assessment center, while her business simultaneously trained candidates for that assessment center for a fee; (2) interfering with the Internal Affairs investigation of the assessment center by having her business's counsel advise clients against sharing information from their training; and (3) attempting to exert improper influence over Civil Service Department personnel concerning an unregistered client's participation in the assessment center. These three reasons for discharge were identified in Chief Hall's November 1, 2018 letter to Porter as violations of the Dallas Police Department Code of Conduct. We assume, without deciding, that the City's evidence was sufficient to trigger the next step of the *McDonnell Douglas* analysis.

When an employer provides evidence of a legitimate reason for the adverse action, the employee must prove the adverse action would not have occurred "but for" her protected activity. *Alamo Heights*, 544 S.W.3d at 782. Porter does not need to establish that her protected activity was the sole reason for her discharge. *See Tex. Dep't of Human Servs. of State of Tex. v. Hinds*, 904 S.W.2d 629, 634 (Tex. 1995). But she must produce evidence sufficient to raise a material fact issue concerning

–17–

whether—but for her report of Madison's allegations—she would not have been discharged as she was. *See Alamo Heights*, 544 S.W.3d at 782.

In a number of cases, including *Alamo Heights*, the Texas Supreme Court has employed a multi-factor test in its causation analysis, considering:

> [1] temporal proximity between the protected activity and the adverse action, [2] knowledge of the protected activity, [3] expression of a negative attitude toward the employee's protected activity, [4] failure to adhere to relevant established company policies, [5] discriminatory treatment in comparison to similarly situated employees, and [6] evidence the employer's stated reason is false.

*Id.* at 790. But in its most recent discussion of this issue, the court reaffirmed that the standard we are to employ in a retaliatory discharge case such as Porter's is rooted in *Hinds*, that is, "the employee's protected conduct must be such that, without it, the employer's prohibited conduct would not have occurred when it did." *Apache Corp. v. Davis*, 627 S.W.3d 324, 335 (Tex. 2021) (quoting *Hinds*, 904 S.W.2d at 636). Accordingly, we consider the record as a whole—considering all of the significant circumstances from the two series of events relied upon by the parties—to determine whether Porter has carried her burden on this element, employing *Alamo Heights* factors when they are helpful.[6]

---

[6] The *Davis* court stressed that the *Alamo Heights* factors are not always helpful, depending on the facts of the case. It stated that "determining but-for causation cannot be a matter of weighing—or worse, counting—factors that may be helpful in analyzing circumstantial evidence in some situations." *Id.* at 337. The court stressed that it has never suggested that the factors are a substitute for *Hinds*' but-for standard, concluding that they "may be more helpful in some cases and less in others. Some of the factors may actually be a distraction." *Id.* at 336.

While considering the entire record, we focus initially on the time period—less than six weeks long—in October and November 2017, when so many of the events in both narratives occurred.

- During the week beginning October 15, Porter received Madison's allegations of a hostile work environment, reported them to Stokes, and was directed to investigate. She interviewed Gross and others under his command and arranged for Madison's transfer. Meanwhile Porter was contacted by Gross and received a report of certain "concerns" with Madison's performance. Concerned that Gross's allegations and this report were retaliatory, Porter ordered an investigation into whether the performance issues cited in the report were limited to Madison.

  During this week, Porter met with employees of the Civil Service Department and attempted to persuade them to allow one of her business's clients to take the sergeant's exam, although the client had not properly registered.

- On November 7, after receiving the results of the investigation of performance issues by all officers under Gross's supervision, Porter concluded that Gross's allegations against Madison alone were in fact retaliatory. Although Stokes had told her to keep the Madison investigation at the station, Porter submitted a RFCN, requesting an IAD investigation.

- On November 8, Stokes learned of the RFCN, had it withdrawn and deleted, and yelled at Porter for submitting it. Porter insisted that IAD should investigate the matter and resisted Stokes's "attempts to bully [her] into keeping the matter internal to [their] division."

  That same day the sergeant's center was scheduled to begin, and the DPD personnel learned of Porter's serving as a SME while her business was training clients for that exercise. Stokes met with officers from personnel and IAD, and Stokes signed a Blue Team requesting an investigation of Porter.

- On November 9, Porter sent a detailed written report of Madison's allegations and her investigation of Gross to Stokes and Stokes's supervisor. On November 15, Stokes signed a Blue Team requesting an investigation of Gross and Madison.

- On November 14, Igo confirmed with Porter that he was investigating her. On November 16, attorneys for Porter's business sent a letter to clients reminding them of their confidentiality agreement concerning their training.

- On November 22, Porter was placed on administrative leave.

We take as true all evidence favorable to Porter, and we indulge every reasonable inference—and resolve any doubts—in her favor. *See Alamo Heights*, 544 S.W.3d at 771. Moreover, Porter did not need to establish that her request for an IAD investigation of Gross's conduct was the sole cause of the employment action. *See City of Dallas v. Siaw-Afriyie*, No. 05-19-00244-CV, 2020 WL 5834335, at *6 (Tex. App.—Dallas Oct. 1, 2020, no pet.) (mem. op.). "All that is required is evidence from which a factfinder may infer that retaliation motivated the adverse employment action in whole or in part." *Id.* (citing *Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 655 (5th Cir. 2004)).

Applying that standard, the evidence shows that Porter conducted an investigation into discriminatory conduct, as her supervisor directed. But when her investigation revealed not only evidence of discrimination but also evidence of subsequent retaliation by Gross, her supervisor reacted with anger at her request for an IAD investigation. And immediately after his angry confrontation with Porter, that supervisor and representatives of IAD initiated an investigation into Porter's business and her role in the Assessment Center. No such investigation was prompted by Porter's report to the DPD that she had formed her business. Nor was an investigation begun when Porter "forcefully" attempted to assist a client of that

–20–

business who had not properly registered for the promotion proceedings, even though the City now contends that single meeting was an independent ground for discharging her. The investigation began only—and immediately—after Porter attempted to initiate an IAD investigation based on what she believed was Gross's discriminatory and retaliatory conduct toward Madison. It is undisputed that IAD's investigation of Porter developed and identified the three reasons ultimately given by the DPD for Porter's discharge. We determine that a reasonable juror could conclude that, but for Porter's report of Gross's discriminatory conduct to IAD, her discharge would not have occurred when it did.

The City argues that the time between Porter's RFCN and her discharge—almost an entire year—is too long to ascribe any connection between the two events. We acknowledge that some cases have looked solely to the time between a plaintiff's protected act and the ultimate adverse employment action when discussing causal connection. The City cites *Alamo Heights* in this regard. 544 S.W.3d at 790 ("Temporal proximity is relevant to causation when it is 'very close.'"). However, the Supreme Court reminds us in that same opinion that "we cannot disregard evidence necessary to show context" in evaluating a plea to the jurisdiction. *Id.* at 791. When it comes to temporal connections in this case, we must view the evidence in context. *See Mooney v. Lafayette Cnty. Sch. Dist.*, 538 F. App'x. 447, 454 (5th Cir. 2013) ("temporal proximity between protected activity and an adverse employment action should be viewed in the context of other evidence"). Doing so,

we conclude that a reasonable juror could conclude Porter has evidenced relevant temporal connections—significantly shorter than one year—between DPD conduct and her submitting the request for an IAD investigation: (1) Igo made his final report concluding that Porter should "be held accountable," and Chief Hall signed off on it, by March 6, 2018, four months after Porter submitted the RFCN; (2) Igo's conclusions were used to support a decision to re-do the Assessment Center on February 6, 2018, three months after the RFCN submission; (3) Porter was placed on administrative leave on November 22, 2017, fifteen days after the RFCN; and (4) Stokes signed the RFCN requesting investigation of Porter the same day he learned of Porter's RFCN requesting investigation of Gross.[7]

For its part, the City asks us to accept the one-year time period as evidence there was no temporal connection between Porter's RFCN and her termination. But it appears from our record that the DPD investigation was completed at the latest by early March 2018. The City produced no evidence explaining the passage of time between that March decision to hold Porter "accountable"—signed by both the IAD investigator and the Chief of Police—and her November discharge. Without such

---

[7] We do not suggest that these incidents of DPD conduct are statutory adverse employment actions. Rather, we view them as making up "a chronology of events from which retaliation may plausibly be inferred." *See Mooney*, 538 F. App'x. at 454 ("The causal connection prong, for example, may also be satisfied when the plaintiff relies upon a chronology of events from which retaliation may plausibly be inferred.") (citing *Brady v. Houston Indep. Sch. Dist.,* 113 F.3d 1419, 1424 (5th Cir.1997)). Again, we are required to draw all reasonable inferences in favor of Porter. *Alamo Heights*, 544 S.W.3d at 771.

evidence, we cannot, in essence, hold eight months of the one-year time period against Porter in her effort to raise a fact issue on causation

We conclude that Porter has offered sufficient evidence to raise a material fact issue on the element of causation. While her report of discriminatory conduct may not have been the sole cause of her termination, we conclude that she has offered circumstantial evidence that—but for that report—she would not have been terminated when she was.[8] We overrule the City's third issue.

### Time-Barred Claims

In its fourth issue, the City argues that the trial court erred in denying its plea "as to all of Porter's claims other than her retaliatory discharge claim because all of Porter's other claims are untimely." It asks us—"at a minimum"—to dismiss all of Porter's claims related to allegedly adverse employment actions that occurred before October 10, 2018, i.e., actions that occurred more than 180 days before Porter filed her charge with the Texas Workforce Commission.

Porter initially pleaded TCHRA claims for discrimination as well as retaliation. After the City filed its plea to the jurisdiction, Porter nonsuited her discrimination claims. Then, in her response to the plea, she stated,

---

[8] We note that Porter's circumstantial evidence spoke to a reasonable interpretation of several *Alamo* Factors including: the temporal-connection evidence listed above; evidence that within less than forty-eight hours IAD learned of requests for investigation *by* Porter and *of* Porter; evidence that Porter's immediate supervisor learned of her RFCN, had it deleted, yelled at her for submitting it, and then participated the same day with IAD personnel in initiating the investigation of Porter; and Porter's and Gates's testimony challenging the factual underpinnings of all three purported grounds of her termination. *See Alamo Heights*, 544 S.W.3d at 790.

> This is a retaliation case under the Texas Commission on Human Rights Act, TEX. LAB. CODE § 21.001 et seq. (the "TCHRA"). Plaintiff LaToya Porter is an African-American female. And race and gender discrimination play a significant evidentiary role in this case. But the cause of action at issue here is not discrimination; it is retaliation.

Porter noted that she "has nonsuited all non-retaliation claims." When the City raised this timeliness issue at the plea hearing, Porter's counsel explained that "the other acts that lead to the termination are considered part of the causal chain . . . but, yes, Your Honor, it is the termination that is the adverse employment action that we were contesting." Thus, in her pleadings and statements to the trial court, Porter has narrowed her claims to retaliation based upon her termination.

In its brief to this Court, the City contends that Porter continues to plead "nineteen allegedly adverse employment actions, each of which she asserts are independent acts of retaliation." Porter's live pleading does indeed identify the nineteen acts in question as "adverse employment actions," but they are listed under the heading of "FACTS," not independent causes of action. And Porter has re-affirmed in this Court that her statutory claim is based solely upon her termination.

The United States Supreme Court has addressed the general rules for application of a statutory deadline to file administrative charges. "[D]iscrete discriminatory acts are not *actionable* if time barred, even when they are related to acts alleged in timely filed charges." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 102 (2002) (emphasis added). However, a statute's charge deadline does not "bar an employee from using the prior acts as *background evidence* to support a

timely claim." *Id.* (emphasis added). Both parties depend on *Morgan* in this Court, and we conclude that the record supports its application here. Porter's factual allegations that occurred before October 10, 2018 are not actionable, *see id.*, and Porter has represented that she does not intend to treat them as such by submitting multiple claims of retaliation to the jury. Porter's earlier factual allegations may be used as background evidence to support her timely claim for retaliatory discharge, *see id*. Porter has represented that she intends to use the earlier factual allegations in that fashion to evidence retaliatory motive. The City agrees that, in a retaliation claim, this kind of background information is relevant at trial.

We conclude that Porter has not pleaded claims based on any adverse action that occurred before October 10, 2018. Accordingly, no such claims exist to be dismissed as the City requests. We overrule the City's fourth issue.

***

We have overruled each of the City's specific arguments challenging the trial court's denial of its plea to the jurisdiction. We conclude that Porter's claim for retaliatory discharge sufficiently alleges conduct that violates the TCHRA to waive the City's governmental immunity. Thus, the trial court did not err when it denied the City's plea to the jurisdiction, and we overrule its first issue.

## Conclusion

We affirm the trial court's May 26, 2022 Order denying the City's plea to the jurisdiction. We remand this case for further proceedings.

/Bill Pedersen, III/
BILL PEDERSEN, III
JUSTICE

220529F.P05



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

CITY OF DALLAS, Appellant

No. 05-22-00529-CV      V.

LATOYA K. PORTER, Appellee

On Appeal from the 14th Judicial District Court, Dallas County, Texas Trial Court Cause No. DC-19-17257. Opinion delivered by Justice Pedersen, III. Justice Garcia participating.

In accordance with this Court's opinion of this date, the May 26, 2022 Order of the trial court is **AFFIRMED**.

It is **ORDERED** that appellee LaToya K. Porter recover her costs of this appeal from the appellant City of Dallas.

Judgment entered April 12, 2023